UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

RICHARD SERVILLO,

        Plaintiff,

v.                                   Case No. 2:20-cv-130-JLB-NPM

SOLA MEDI SPA, LLC,

        Defendant.

_____

## REPORT AND RECOMMENDATION

Plaintiff Richard Servillo moved for default judgment as to his claims of sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Florida Civil Rights Act ("FCRA"). (Doc. 12). The Court granted the motion as to liability but reserved ruling on damages pending an evidentiary hearing, which was conducted on May 3, 2021. (Docs. 13, 18). The defaulted Defendant, Sola Medi Spa, LLC ("SMS"), received notice of the hearing but failed to appear.[1]

---

[1] SMS's owner, Tricia Tobias, appeared at the courthouse later the same day and filed a request to reopen the hearing (Doc. 19). Among other reasons, the request was denied because an entity defendant may only appear through counsel. (Doc. 21).

## I.      Background and Hearing Testimony

In the Complaint, Servillo alleges he began his employment with SMS in January 2019[2] as a salesman/marketer. (Doc. 1 ¶ 8). He claims his direct boss, Tricia Tobias, immediately began engaging in unwanted physical touching and sent sexually explicit communications to him. (Doc. 1 ¶¶ 10-12). Specifically, Servillo claims Tobias attempted to kiss him and touch his genitalia, and she sent provocative photographs and text messages. (Doc. 1 ¶¶ 11-12). He alleges Tobias conditioned his continued employment on engaging in a romantic or sexual relationship with her, and after he refused, Tobias terminated his employment around January 31, 2019. (Doc. 1 ¶¶ 12-13; Doc. 12-1).

During the hearing, Servillo testified that he moved from New Jersey to southwest Florida to take the job with SMS. He did not rent or buy housing, but rather stayed with friends—and continues to still live with friends. While working at SMS in January 2019, Servillo earned $935 per week.

After his termination he was unemployed until April 2019 when he found part-time work as a security guard at the Blue Martini restaurant. Servillo still works at the restaurant three nights per week and earns $200 per week (or $800 per month). Servillo was unsure he could make $935 per week at his current job within the next

---

[2] In his Declaration, Servillo claims he began his employment at SMS in December 2018. (Doc. 12-1 ¶ 4).

6 months, and then stated there are no current jobs at the Blue Martini that offer $935 per week.

As for the emotional impact of the harassment and retaliatory termination, Servillo testified he never would have moved to Florida but for the job at SMS. Servillo also stated he could not sleep, was embarrassed because he could not make ends meet, had to sell some stocks and touch his retirement funds early, had "stomach issues," and could not afford psychological treatment. But these symptoms did not affect his ability to obtain employment. In fact, he stated he was always ready, able, and willing to work.

Finally, Servillo clarified the corporate structure of SMS as he understood it. He explained that Tobias was the sole owner of SMS, which has at least two locations he is aware of. He also claimed Tobias was involved in the day-to-day management of SMS. Therefore, he had no other superior to whom he could complain about Tobias's behavior.

The Court finds Servillo's testimony credible in most respects but questions his post-termination conduct for reasons explained more in depth later. *See Select Exp. Corp. v. Jack Richeson & Co.*, No. 10-80526-CIV, 2011 WL 13135154, *1 (S.D. Fla. Nov. 9, 2011), *aff'd sub nom. Select Exp. Corp. v. Jack Richeson & Co.*, 520 F. App'x 834 (11th Cir. 2013) (quoting *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002) ("Credibility determinations are typically the

province of the fact finder because the fact finder personally observes the testimony and thus is in a better position than a reviewing court to assess the credibility of witnesses.")).

## II.   Damages

After Servillo testified, plaintiff counsel made additional arguments, which he briefly clarified in a post-hearing Notice as requested by the Court. (Doc. 20). Servillo revised some of the damages figures, explained in more depth below. And since the Court previously explained the different types of damages sought, this report reincorporates that discussion by reference to avoid repetition. (*See* Doc. 13, pp. 6-11).

### A.   Back pay

Servillo seeks back pay from January 31, 2019, to the present (117 weeks), which he offsets with his earnings at his current job. In total, he seeks $87,795 in back pay using the following breakdown:

Gross Back Pay (Jan. 31, 2019 to Present = 117 weeks)

$935.00/week (prior rate of pay) x 117 weeks = $109,395.00

Interim Earnings (April 2019 to Present = 108 weeks)

$200.00/week x 108 weeks = $21,600.00

Final Back Pay Calculation

$109,395.00 (gross back pay) - $21,600.00 (interim earnings) = $87,795.00 (Doc. 20, p. 2).

"[A]n award of back pay is intended to make the claimant whole, not to confer a windfall." *E.E.O.C. v. Joe's Stone Crab, Inc.*, 15 F. Supp. 2d 1364, 1378 (S.D. Fla. 1998). While a defendant bears the burden to show that substantially comparable work existed to mitigate back-pay damages, *Galbreath v. Hale Cty., Alabama Comm'n*, 754 F. App'x 820, 830 (11th Cir. 2018), an unemployed or underemployed plaintiff "is subject to the statutory duty to minimize damages." *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982) (citing 42 U.S.C. § 2000e-5(g)(1) ("Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.")).

The 8-week period between Servillo's January 31, 2019 termination and his new employment in April 2019 warrants compensation at his prior $935 per week earning figure. Given his surprise and wrongful termination, eight weeks is a reasonable amount of time to look for other employment. But the amount of back pay sought after April 2019 is excessive.

Servillo's current employment as a part-time security guard for a restaurant does not appear to be substantially equivalent to his prior position as a (presumably full-time) salesman/marketer for SMS (Doc. 1 ¶ 8), particularly given the large wage

5

difference. Servillo failed to explain why he could not obtain work as a salesman or marketer for a different company that could have offered higher wages. Servillo also failed to explain why he only works three nights per week since he is ready, able, and willing to work. This evidence indicates Servillo is deliberately underemployed. His failure to obtain equivalent employment, whether in salary or job title, beyond October 2019 (and through to the present) is too attenuated from his termination to justify the full compensation he seeks.

Courts may decrease a back-pay award due to a plaintiff's failure to present supportive evidence. *See U.S. EEOC v. DMK of JAX, Inc.*, No. 3:07-cv-920-16HTS, 2008 WL 5191586, *1-3 (M.D. Fla. Dec. 10, 2008) (awarding $500 in back pay because court only had plaintiff's self-serving testimony, her credibility was doubtful, and there was a complete lack of documentary evidence after hearing to determine damages for default judgment motion). In light of all the circumstances, it is fair to infer that after his two months of unemployment in February and March 2019, Servillo could have earned at least $600 per week if he diligently sought full employment. *See Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 476 (11th Cir. 1999) (quoting *Gore v. Turner*, 563 F.2d 159, 164 (5th Cir. 1977)) ("Compensatory damages 'may be inferred from the circumstances as well as proved by the testimony.'"). Therefore, Servillo should be awarded **$17,865** in back pay, using the following breakdown:

Adjusted Gross Back Pay (February 2019 through October 2019 = 39 weeks)

$935.00/week (prior rate of pay) x 39 weeks = $36,465

Adjusted Interim Earnings (April 2019 through October 2019 = 31 weeks)

$600/week ($200/week x 3) x 31 weeks = $18,600

Final Back Pay Calculation

$36,465 (adjusted gross back pay) - $18,600 (adjusted interim earnings) = **$17,865**

## B.   Front pay in lieu of reinstatement

Next, Servillo reduced the amount of front pay he seeks from $24,310 to $19,110. (*Compare* Doc 12, p. 6 *with* Doc. 20, p. 2). He calculated this amount with the following breakdown:

$935.00/week - $200.00/week = $735.00/week

$735.00/week x 26 weeks = $19,110.00.

(Doc. 20, p. 2). Servillo explained the 26-week (6-month) period is intended to cover the slow off season in southwest Florida. This period is, according to Servillo, a time to bridge the gap to help him "get on his feet."

Front pay is an equitable remedy, and the court must "consider what is fair and reasonable under the circumstances." *Armstrong v. Charlotte Cty. Bd. of Cty. Comm'rs*, 273 F. Supp. 2d 1312, 1314, 1317 (M.D. Fla. 2003). While prevailing Title VII plaintiffs are presumptively entitled to either reinstatement or front pay,

*see Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1528 (11th Cir. 1991) (superseded by statute on other grounds), Servillo has provided no support for an award of front pay. And the Court has already rejected reinstatement as a practical remedy here. (Doc. 13, p. 8).

Servillo did not explain why he is underemployed. He claimed he could not earn a weekly wage of $935 within the next 6 months at the Blue Martini. But he did not explain why he could not find other work, for example, as a full-time salesman or marketer who could earn $935 per week. Or perhaps he could have gotten a second part-time job since he only works three nights per week.

He also did not sufficiently explain why he should be compensated for 26 weeks. Servillo's logic is not persuasive because he failed to present any evidence that he was actually affected by the off season in southwest Florida. Rather, his testimony suggests Servillo has been steadily employed at the Blue Martini since April 2019 at a constant rate of pay of $200 per week without any fluctuation throughout the year. Having failed to provide any solid foundation for his claim for front pay despite having no opposition from the defaulted Defendant, Servillo should not be awarded any front pay.

**C.    Non-economic damages**

Servillo initially estimated that "$25,000 in damages would be appropriate remuneration for [his] mental and emotional damages." (Doc. 12-1 ¶ 8). But he has

reduced his request to $15,000. (Doc. 20, p. 3). Servillo testified that he could not sleep, was embarrassed because he could not make ends meet, had "stomach issues," and could not afford psychological treatment. He sold stocks and dipped into his retirement funds, garnering penalties for early withdrawal. He also testified that he moved from New Jersey to Florida for the job at SMS. Confusingly, he claimed he had no way to get back to New Jersey to obtain other employment even though he did not own a home or even have a lease because he was, and currently is, still living with friends. Without any apparent ties to Florida, it is unclear why Servillo claims to be unable to return to New Jersey, let alone, why that matters.

Servillo's declaration also details more of the symptoms he experienced, that the symptoms persisted for approximately 10 months after his termination from SMS, and that he continues to lack trust in employers. (Doc. 12-1). While the Court acknowledges Servillo's testimony that he could not afford psychological treatment, the sparse details to support his claim do not go unnoticed. Servillo could have explained in more detail what happened to him during his employment at SMS. He could have explained the severity his symptoms. He could have even explained how his lack of trust in employers has affected his current employment. While he may not have received formal treatment for his psychological problems, nothing prevented Servillo from having friends, relatives, or colleagues testify on his behalf.

Simply put, Servillo failed to rise to the District Court's directive to show that the requested amount of non-economic damages is reasonable. (Doc. 13, pp. 9-10).

The Court has already found, based on Servillo's declaration, that he is entitled to *some* amount of non-economic damages. (Doc. 13, p. 10) (emphasis in original). Some emotional damage can be reasonably inferred to result from Servillo's allegations of sexual harassment and retaliation. "Any evidentiary shortcomings 'go more to the amount, rather than the fact, of damage'" *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 476 (11th Cir. 1999). But given the short length of employment at SMS and skimpy support, Servillo should be awarded **$2,000** for non-economic damages. *See Arain v. Double R. Remodeling, Inc.*, No. 6:08-cv-2036-Orl-28KRS, 2010 WL 11507298, *3 (M.D. Fla. Apr. 21, 2010), *report and recommendation adopted*, No. 6:08-cv-2036-Orl-28KRS, 2010 WL 11507299 (M.D. Fla. May 20, 2010) (recommending no emotional distress damages because while plaintiff testified he was emotionally distressed by certain comments, he "did not testify to any ill effects on his mental or physical health, and [he] failed to provide any testimony from medical professionals or others that he was or is indeed suffering from any kind of long term emotional effects.").

## D.    Punitive damages

Lastly, Servillo seeks $25,000 in punitive damages. Punitive damages are an extraordinary remedy to be reserved for egregious cases, and they are only available

under Title VII "when the employer has engaged in 'discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Dudley v. Wal-Mart Stores, Inc.*, 166 F.3d 1317, 1322 (11th Cir. 1999); 42 U.S.C. § 1981a.

But first, to impute discriminatory conduct from an individual in the corporation to the corporate defendant, the Eleventh Circuit applies the higher-management standard, articulated in *Dudley*. *EEOC v. Exel, Inc.*, 884 F.3d 1326, 1331-1332 (11th Cir. 2018). Under this standard, a plaintiff may impute liability for punitive damages to his employer by showing "either that the discriminating employee was high up the corporate hierarchy, or that higher management countenanced or approved [the unlawful] behavior." *Dudley*, 166 F.3d at 1323. Servillo testified that Tobias was the sole owner of SMS and was involved in day-to-day management of her company. Since Tobias was at the top of the "corporate hierarchy," her conduct is imputed to SMS for liability for punitive damages. *See Exel*, 884 F.3d at 1331-1332; *Ash v. Tyson Foods, Inc.*, 664 F.3d 883, 900 (11th Cir. 2011).

While the Court previously observed that the record did not adequately reflect whether the alleged harassment rose to the level of malice (Doc. 13, pp. 10-11), reckless indifference is apparent. To find malice or reckless indifference, the Court must undertake a subjective analysis; this requires the fact-finder to determine that

the employer "at least discriminate[d] in the face of a perceived risk that its actions will violate federal law." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535-537 (1999). Hinging one's employment on having a sexual relationship is exactly the type of reprehensible conduct Title VII is meant to protect against.

While Servillo introduced no evidence concerning Tobias's knowledge of employment discrimination laws, the Court must take as true the uncontested factual allegations in the Complaint. *Enpat, Inc. v. Budnic*, 773 F. Supp. 2d 1311, 1313 (M.D. Fla. 2011) (citing *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987) ("The effect of the entry of a default is that all of the factual allegations in the complaint are taken as true, save for the amount of unspecified damages.")); *see also* Fed. R. Civ. P. 8(b)(6) ("An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied."). And accepting Servillo's allegations as true, Tobias's conduct was objectively reprehensible and there can be no serious argument that she could reasonably believe the alleged conduct was lawful. *See EEOC v. Nunez, Inc.*, No. 1:09-cv-2661-WSD-AJB, 2011 WL 13168394, *34 (N.D. Ga. Feb. 28, 2011), *report and recommendation adopted*, No. 1:09-cv-2661-WSD, 2011 WL 13175436 (N.D. Ga. Mar. 14, 2011); *see also* 42 U.S.C.A. § 2000e-2 (prohibiting employers from discharging and discriminating against an individual because of sex).

An important guide for determining punitive damages is the statutory cap on

all but backpay damages. In intentional discrimination in employment cases against an employer with 100 employees or less, front pay, non-economic, and punitive damages are limited by statute to an aggregate of $50,000. 42 U.S.C. § 1981a(b)(3). So, even if Servillo had faced years of sustained harassment and actual groping or physically threatening advances, the punitive damages could not exceed $48,000 (if he is awarded $2,000 in non-economic damages). *Id.* Here, the degree of reprehensibility of Tobias's—and thus SMS's—misconduct calls for something less. *See Richardson v. Tricom Pictures & Prods., Inc.*, 334 F. Supp. 2d 1303, 1326-1327 (S.D. Fla. 2004) (awarding punitive damages of either $50,000 as chosen by the jury or reducing award to match the back pay amount, whichever amount is lower due to low level of reprehensibility and minimal actual harm), *aff'd*, 183 F. App'x 872 (11th Cir. 2006); *Rubinstein v. Admins. of Tulane Educ. Fund*, 218 F.3d 392, 407-409 (5th Cir. 2000) (reducing punitive damages award from $75,000 to $25,000, where jury awarded $2,500 in compensatory damages and nothing for emotional damage); *Brissette v. Franklin County Sheriff's Office*, 235 F.Supp.2d 63, 94 (D. Mass. 2003) (affirming punitive damages award of $20,000 to each plaintiff after years of harassment at correctional institution because "the evidence of a deliberate, vindictive and malicious desire to punish the plaintiffs—to actually injure them emotionally—for asserting their rights makes an award of punitive damages appropriate"); *Whitten v. Cross Garage Corp.*, No. 00 CIV.5333 JSM FM, 2003 WL

21744088, *6 (S.D.N.Y. July 9, 2003) (recommending $20,000 in punitive damages on default judgment because employee was subject to shocking racial epithets and deprived of toilet facilities during last year of employment).

Next, the ratio of punitive to compensatory damages provides further instruction. The Supreme Court has refused to "draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable" ratio of punitive to compensatory damages. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 582 (1996). But, the Supreme Court observed that "the median ratio of punitive to compensatory award has remained less than 1:1" and found such a ratio to be a fair upper limit in some circumstances. *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 497-499, 512-513 (2008). Likewise, a 1:1 ratio of compensatory to punitive damages is appropriate here. Given the recommendation that Servillo be awarded an aggregate amount of $19,865 in back pay and non-economic damages, an equal amount would be appropriate to meet the punitive goals of "retribution and deterring harmful conduct." *Id.* at 492.

Given the statutory cap on damages, the circumstances of this case, and the factors and authority considered above, a 1:1 ratio of compensatory to punitive damages is appropriate, particularly given the award of similar amounts in other cases. Falling within the midrange of the statutorily permitted amount, Servillo should be awarded **$19,865** in punitive damages.

## III.   Conclusion and Recommendation

For the above reasons, the Court should award Servillo $17,865 in back-pay damages, $2,000 in non-economic damages, and $19,865 in punitive damages for an aggregate sum of $39,730.

Reported in Fort Myers, Florida on July 13, 2021.

Nicholas P. Mizell
NICHOLAS P. MIZELL
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1. **To expedite resolution, parties may file a joint notice waiving the 14-day objection period.**